Filed 7/2/26  In re A.L. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | B343531 (Los Angeles County Super. Ct. No. 19CCJP03597) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Nancy Ramirez, Judge.  Affirmed, in part, and dismissed, in part.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn L. Harrison, County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

## I.    INTRODUCTION

D.C. (mother) appeals from the juvenile court's continued placement order at the 12-month review hearing, arguing the court erred by not returning A.L. (the child) to her custody.  She also challenges the court's finding that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901; Welf. Inst. Code, § 224 et seq.[1]) did not apply.  We affirm the placement order and dismiss as moot the challenge to the ICWA finding.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

A.    *Prior Section 300 Petition on Behalf of Siblings*

In June 2019, the juvenile court sustained a section 300 petition on behalf of the child's older siblings[2] alleging that mother had mental and emotional problems which rendered her

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    The child's five older siblings (the siblings) are H.L., born January 2007; Jo.L., born January 2009; J.L., born March 2013; and I.L. and D.L., born June 2014.

unable to supervise and care for those children and that their father, J.A. (father), was aware of her issues but failed to protect them. The court ordered family maintenance services and terminated jurisdiction in May 2020 after finding the parents in compliance with their case plan.

B.    *Adjudication and Disposition*

On December 19, 2022, the Department of Children and Family Services (the Department) filed a section 300 petition on behalf of the child, then 10 months old, and his siblings under subdivisions (b), (c), (d), and (j).

At the March 22, 2023, jurisdiction hearing, the juvenile court sustained, as amended, allegations that: father sexually abused then 15-year-old H.L. on multiple occasions and, on at least one of those occasions, abused her in the presence of her 13-year-old sister J.L.; father provided H.L. with marijuana and "miscellaneous items for sexual[ ] abus[e];" and mother failed to protect the children from father's conduct. The Department further alleged that: in 2022, and on one other prior occasion, father sexually abused an unrelated minor; and he had also sexually abused J.L., telling her not to disclose the abuse. The court continued the matter for disposition.

C.    *Section 342 Petition*

On June 9, 2023, the juvenile court sustained a section 342 petition filed on behalf of the child and his siblings, finding that: mother and father "created a detrimental and endangering home environment for the children" by failing to properly supervise them and allowing members of the household to sexually abuse

3

Jo.L.; mother failed to participate and engage in H.L.'s mental health treatment; and H.L. was recently under the influence of methamphetamine while in the home.  At the combined disposition hearing on both petitions, the court ordered the child removed from mother, continued his current suitable placement, and ordered monitored visitation with mother.[3]  The court set the matter for a six-month review hearing.

D.    *Six-Month Status Review Period*

In a November 21, 2023, status review report, a social worker observed that the child was "full of energy, playful, kind, curious, and affectionate.  [He] continue[d] to progress in meeting his developmental milestones under the consistent nurturing care of his [caregivers]."  The social worker concluded that the child had "a secure bond with his [caregivers and was] receptive to their comforting and soothing and [would] seek them out.  [He] appear[ed] to have adjusted well to his new resource family and home."

At the continued January 10, 2024, six-month review hearing, the juvenile court found mother's progress "unsubstantial," and continued her reunification services.

---

[3]    Mother appealed from the jurisdiction and disposition orders, but, on June 4, 2024, her appellate counsel filed a brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835 and, on July 10, 2024, the appeal was dismissed as abandoned.

E.      *12-month Status Review Period*

On April 29, 2024, the child's counsel filed an objection to the Department's request to begin overnight visits between mother and the child.  At a May 6, 2024, hearing, the juvenile court overruled the objection and allowed the overnight visits, but ordered the Department to make unannounced visits during the overnight visits and to provide further information on mother's progress.

On May 16, 2024, the Department filed a status review report in which it described the concern of the child's caregivers about sexually inappropriate behavior amongst siblings and that the child's behavior was regressing.  The caregivers added that the child had difficulty regulating his behaviors when he returned from visits with mother.

The Department also reported that the child was doing well developmentally, had "a strong attachment with his caregivers, and his caregivers [had] developed a strong attachment with [him], so much so that they [had] expressed they want[ed] to provide permanency to [him]."

The Department recommended that the permanent plan for the child should be "immediate return to the home of mother because the child [could] now be safely maintained in the home." The Department also recommended family maintenance services.

On July 24, 2024, the juvenile court held the continued 12-month review hearing.[4]  The court ordered that H.L., J.L., and

---

[4]      In a report prepared on July 18, 2024 (that is, before the July 24 hearing, but apparently not submitted to the juvenile court until September 5, 2024, in a last minute information), a social worker reported that during a session with a child

5

D.L. be returned to mother's custody. As for I.L. and the child,[5] the court, after conferring with counsel, continued the contested hearing.

## F.     *The Contested 12-Month Review Hearing*

### 1.     August 29, 2024, Last Minute Information

In an August 29, 2024, last minute information, the social worker reported that D.L. continued to receive psychiatric monitoring and individual therapy. During a home visit on August 7, 2024, the social worker observed D.L. becoming increasingly agitated when J.L. refused to let him participate in her session with a behavioral therapist. D.L. started to have a

---

behavioral therapist on July 3, 2024, D.L., "became highly agitated[,] … physically aggressive[,] and hit, kicked[,] and pushed both [the therapist] and mother. Mother was able to restrain [D.L.] while [therapy] staff contacted [police] who later contacted the [Statewide Mental Assessment Response Team (SMART)]. The child was taken to Olive View and was transferred to Loma Linda Behavioral Medic[al] Center on [July 5, 2024]. [On July 8, 2024], the hospital social worker … [advised] that [D.L.] and an 8-year-old boy had engaged in appropriate [*sic*] touching. The hospital investigated the matter and it was decided to keep the boys apart with adult staff always at each boy's side during any interaction. … [D.L.] was discharged on [July 11,] 2024."

[5]     Counsel for Jo.L. requested that his matter be continued to the date set for the contested hearing so Jo.L., who was in juvenile detention, could appear and decide whether to contest the recommended placement, and the juvenile court granted that request.

tantrum, pushed and hit mother, threatened suicide, and then started to cry when mother asked him if he wanted to return to the hospital. Mother contacted the police. D.L.'s school also advised that there had been several incidents during which he refused to get on the school bus and became verbally and physically aggressive, requiring either H.L. or mother to take him to school. During one incident (on the day before the August 29 last minute information was filed), D.L. refused to board the school bus and, after mother took him to school, D.L. refused to enter the school, and ran across a major street in front of the school. As mother and D.L. returned home, D.L. continued to hit mother, pulled his own hair, and tried to take control of the steering wheel. After D.L. threatened to kill himself, mother pulled the car over and called 911. The police arrived and transported D.L. to a hospital where he was kept overnight for observation.

2. September 5, 2024, Last Minute Information

In a September 5, 2024, last minute information, the social worker reported that mother continued to live with H.L., J.L., and D.L. Paternal aunt, who lived at the same property as the family, reported that she had not seen any abuse or neglect by mother. And, she did not observe any behavioral problems with H.L. or J.L., but had seen D.L. have tantrums and attempt to hit mother. She did not, however, see him be physically or verbally aggressive with other adults or children. The paternal uncle had also seen D.L. aggressive toward mother and admitted that it was sometimes necessary to call law enforcement to deal with him. He had not seen D.L. hurt any other adults or children and believed mother did her best with a difficult child.

7

Mother had recently completed therapy in mid-July 2024. She also participated in weekly sessions with the therapist for J.L. and D.L., as well as all child and family team meetings regarding the children. In addition, she participated in family sessions with Jo.L.'s therapist in preparation for his return home following completion of his service of a term of probation. And, mother was participating in weekly sessions with the social worker who provided mental health services for the child.

### 3.    September 5, 2024, Hearing

On September 5, 2024, the juvenile court commenced the review hearing. The child's caregiver, M.B., a licensed clinical psychologist, testified that she had been one of the child's caregivers for 16 months, since May 12, 2023. Although the child had been in her care for over a year, she was not seeking to adopt him. M.B. began monitoring the child's visits with mother in May or June of 2023 and she stopped monitoring them around April 2024.

While monitoring visits, M.B. observed that mother was disengaged, using her phone for a significant portion of the visits, and that H.L. would care for the child instead. Once visits changed to unmonitored status, M.B. observed that the child would run off during visits and mother would not follow him. Further, M.B. needed to prompt mother to change the child's diaper. M.B. also noticed changed behaviors in the child when he returned from visits, including "[a]ggressive behaviors. Throwing toys. Hitting. Scratching. Sometimes throwing himself on the ground. Rolling. Crying. Screaming at a high octave. Difficulties with sleep. … [D]ifficulties falling asleep, staying

asleep. Difficulty waking up in the morning. … [H]e would often indicate that he was hungry."

When the child returned to the caregiver after one of his overnight visits with mother and disrobed, M.B. heard him say, "no [D.L.], no [D.L.], owie friend, no [D.L.], no [D.L]. while covering his genitals." M.B. further explained that, since the child began overnight visits with mother, he had been "showing more aggressive behaviors … such as … hitting, scratching, yelling, throwing himself on the floor, … knocking things over intentionally, picking up his toys [and throwing them across the room]."

After hearing argument from counsel, the juvenile court continued the hearing to October 9, 2024.

### 4. October 7, 2024, Last Minute Information

In an October 7, 2024, last minute information, the social worker reported that mother continued weekend visits with I.L. and the child. On September 15 and 29, 2024, the social worker made two unannounced visits to mother's home. Mother and the children had just returned from the park when the social worker arrived for the first visit, and the child was sleeping while I.L. and D.L. were playing. According to mother, there had been no fighting among the children during the weekend visit and, "although [D.L.] exhibited some tantrums, he did not attempt any physical or verbal aggression toward [the child or I.L.]."

During the second visit, the social worker was able to observe the family for an hour, during which time the child and J.L. "snuggl[ed] together while watching a video on mother['s] phone. [D.L.] started to have a tantrum but left the converted garage where the family live[d] and went to the main house on

9

the property … [and] did not rejoin the family … ." According to mother, D.L. was responding positively to his new medication, his tantrums were less frequent, and he was never aggressive with the child.

On October 2, 2024, a court-ordered team meeting was held to develop a safety plan that would enable the child to be returned to mother's custody. The social worker described the primary concerns to be addressed as: (1) "a lapse in services by Regional Center as his case would need to be transferred to another Regional Center office and service vendors would need to be located in the mother's geographical area"; (2) "sustaining the progress that [the child had] made"; (3) "consistency and follow through by mother with the child's services"; (4) "addressing the child's sense of loss as to the caregivers with whom he has been living over one year"; and (5) "the challenges that will arise for both [the child] and mother … once he transitions to mother's home, including his safety and the establishment of a stable home environment." Among the action steps identified to address these concerns was "developing a plan to include the relatives to assist with [D.L.] and protect [the child] by having them remove the other children and/or run interference with [D.L.] who seem[ed] to respond positively to some of his relatives when [he had] an episode in which he exhibit[ed] any aggression or threats to hurt others or himself."

### 5.     November 8, 2024, Last Minute Information

Following another continuance of the review hearing, the Department submitted a November 8, 2024, last minute information which indicated that the plan formulated at the team meeting for protecting the child from D.L.'s aggressive behaviors

10

may no longer be adequate because D.L.'s mental health needs required additional support.  Moreover, according to the social worker, the presence of Jo.L. in mother's home was becoming disruptive and presented an additional risk to the child.  The social worker advised that mother had a meeting at D.L.'s school to address "the grave concerns presented by school staff and the school's inability to teach [D.L.] due to his aggressive and unpredictable behavior … ."  Mother expressed a desire to place D.L. in a residential treatment facility.  The social worker further reported that on October 30, 2024, D.L. was hospitalized "after he threw and broke a laptop at school and hit another student.  Mother was called to pick him up and [he] attempted to run across the street, hit and pulled mother's hair, and threatened to kill himself."  Mother called 911, and D.L. was transported to a hospital and discharged after five days.

The social worker reported that in late October 2024, Jo.L. "ran away from home after he was released to mother under house arrest with an ankle monitor.  He removed the ankle monitor, left the home, but, returned … after two days and turned himself in at the delinquency court … ."  H.L. then reported that Jo.L. attempted to hit D.L. and "put hands on mother in a threatening way.  Mother stated that [Jo.L.] put his hands on her shoulders in a joking manner, but acknowledged that he tried to hit [D.L.]."  The social worker concluded that the "issues with [D.L. and Jo.L.] negatively impact mother['s] … ability and resources to ensure a safe home environment for [I.L. and the child] without additional support or other strategies that will protect [them]."

11

6.    <u>November 22, 2024, Last Minute Information</u>

In a last minute information filed November 22, 2024, the social worker reported that Jo.L. was arrested on November 10, 2024, and released to mother under house arrest with an ankle monitor. According to the social worker, he was "now the subject of a new petition and charge … [and] a new assessment ha[d] been ordered to address the petition and charge. He [was] scheduled for a [section] 241.1 joint assessment and hearing on [December 20, 2024]."

The child continued to visit mother on the weekends. The Department recommended that I.L. be released to mother but changed its recommendation as to the child, requesting in lieu of return that mother be granted an extended visit with him.

7.    <u>November 25, 2024, Hearing</u>

At the November 25, 2024, continued hearing, the child's counsel argued that the juvenile court should not authorize an extended visit with mother because there had been no change in circumstance, there was evidence that Jo.L. was abusing D.L. and hitting mother, and the child was "the youngest of all these children and [was] unable to really verbally indicate whether or not he would be in danger."

Mother argued that I.L. and the child should be returned to her custody or, in the alternative, the child should have an extended visit in her care.

The Department submitted on its recommendation, stating, "The Department believes mother has done what she needed to [do] to return [I.L.] home. I believe an extended visit for [the child] would be appropriate until the next hearing. Submit."

12

Following argument, the juvenile court found that although mother was in substantial compliance with her case plan, the child would be at substantial risk of harm if returned to her care. The court observed that mother had seven children in her care[6] and that Jo.L. had an active juvenile justice case, had been disruptive in the home, and had placed his hands on mother. The court also noted D.L.'s continued behavioral issues, which included aggressive and violent conduct. Although mother and the Department were trying to find a residential program where D.L. could be placed, he remained in the home. The court expressed concern that mother could not adequately supervise and protect the child in the home given that he was only two years old and nonverbal. The court therefore continued reunification services and declined to return the child to mother's home or place him on an extended visit until the next hearing.

On January 14, 2025, mother timely filed a notice of appeal.

## III.   DISCUSSION

### A.   *Denial of Request to Return Child to Home*

Mother contends there was no substantial evidence to support the juvenile court's finding at the 12-month review hearing that returning the child to her care would create a substantial risk of detriment to him. Mother argues that because she was in substantial compliance with her case plan and had

---

[6]     At the time of the hearing, mother had four children in her care: H.L., J.L., and D.L., who had been previously released to her, and Jo.L., who had recently been released from juvenile detention to her custody.

done all that had been asked of her, the court should have either returned the child to her care at the November 2024 review hearing or approved an extended home visit for him until the next review hearing.[7]

      1.      <u>Legal Principles and Standard of Review</u>

Section 366.21, subdivision (f)(1) provides: "The permanency hearing shall be held no later than 12 months after the date the child entered foster care … . At the permanency hearing, the court shall determine the permanent plan for the child, which shall include a determination of whether the child will be returned to the child's home and, if so, when, within the time limits of subdivision (a) of [s]ection 361.5. After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

---

[7] In lieu of a respondent's brief, the Department filed a letter brief advising that it was "no longer the proper respondent based on subsequent recommendations made by [the Department] and orders made by the juvenile court at the 18-month review hearing" (fn. omitted) and suggesting that the proper respondent was the child. We ordered the child's trial counsel to notify this court whether the child would be making an appearance but received no response.

Subdivision (f)(2) provides, "Regardless of whether the child is returned to their parent or legal guardian, the court shall specify the factual basis for its decision.  If the child is not returned to a parent or legal guardian, the court shall specify the factual basis for its conclusion that the return would be detrimental."  (§ 366.21, subd. (f)(2).)

"By authorizing the continued removal of a child from parental custody based on the risk of either physical detriment or emotional detriment, sections 366.21 and 366.22 focus on the child's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention.  [Citation.] Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency [citation], the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child."  (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.)  "Hence, the question whether to return a child to parental custody is not governed solely by whether the parent has corrected the problem that required court intervention; rather, the court must consider the effect such return would have on the child."  (*Id.* at p. 901.)

"We review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence, contradicted or uncontradicted, supports the court's finding." (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1034.)  "'We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court.'"  (*Ibid.*)

2.    Analysis

Here, the juvenile court considered the entire history of the case, not just mother's progress, in reaching its decision not to return the child to her care.  As the court observed, if the child, who was only two years old and nonverbal, were returned to mother's care, he would reside with D.L., who had been repeatedly violent at home and school, including hitting and kicking mother, and had also been involved in at least one incident of inappropriate touching with a younger child while hospitalized.  The child would also reside with Jo.L., who had new juvenile justice charges pending, was ordered on house arrest in mother's home, and had placed his hands on mother.  Further, during the review period, the child displayed aggressive behavior after visits with mother and made comments suggesting that D.L. may have hurt him.  On this record, we conclude the juvenile court's finding that there was a current risk of detriment to the young, nonverbal child if returned to the home was supported by substantial evidence.

We also reject mother's alternative argument that the juvenile court erred by refusing her request to allow an extended visit with her until the next hearing.  The evidence of D.L. and Jo.L.'s violence toward mother, the fact that the Department and mother were trying to find a residential treatment program in which to place D.L, and the child's comments suggesting that D.L. had hurt him supported the court's decision to await further information from the Department on the stability and safety of home before allowing the child to remain in mother's care there for any extended period.

B.    *ICWA Challenge*

Mother also contends the juvenile court erred by finding ICWA did not apply because the Department failed to ask known and available extended family members if the children were or may be Indian children.  She therefore requests "that the no-ICWA finding be reversed and the matter remanded with directions that the juvenile court direct [the Department] to conduct a meaningful inquiry of any and all readily available relatives about [the child's] potential American Indian ancestry."

In its letter brief, the Department maintains that the ICWA challenge is moot because, at a subsequent hearing on August 13, 2025, the juvenile court ordered the Department to interview all known and available extended family members as to whether the children were or may be Indian children and submit a written report on the results.

Based on the August 25, 2025, orders provided by the Department,[8] we agree that mother has been granted the relief she is requesting in her ICWA challenge and that her challenge is therefore moot.  (See *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639.)

---

[8]    On August 22, 2025, we granted the Department's request to take judicial notice of two minute orders entered by the trial court on August 13, 2025.

17

## IV.    DISPOSITION

The order at the 12-month review hearing denying mother's request to return the child to her custody or, in the alternative, grant her an extended visit with him, is affirmed and her challenge to the juvenile court's ICWA finding is dismissed as moot.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

BAKER, Acting P. J.

MOOR, J.